UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| LEONARD THOMAS, <br><br> Plaintiff, <br><br> v. <br><br> SGT. SHUPPARD, SGT. HUFFMAN, DR. C. KUENZLI, NURSE C. CRITES, NURSE J. KLINE, <br><br> Defendants. | CAUSE NO. 3:24-CV-1018-TLS-AZ |

**OPINION AND ORDER**

Leonard Thomas, a prisoner without a lawyer, filed a complaint which the court must screen pursuant to 28 U.S.C. § 1915A. To proceed beyond the pleading stage, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Thomas is proceeding without counsel, his allegations must be given liberal construction. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That said, a plaintiff can plead himself out of court if he alleges facts that preclude relief. *See, e.g., Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007); *McCready v. Ebay, Inc.*, 453 F.3d 882, 888 (7th Cir. 2006).

*Background/Litigation History*

Thomas was incarcerated at the Miami Correctional Facility (MCF) when he filed this lawsuit but has since been released. He entered the Indiana Department of Correction (IDOC) in 2007 with "preexisting mental illness, schizophrenia, depression, and epilepsy." ECF 1 at 4. He was given additional mental illness diagnoses by IDOC's medical providers throughout the years

and has been prescribed "psychotropic meds antipsychotics and anti-depressants on and off up to the present for auditory and visual hallucinations, and on-going psychiatric disorders, and suicidal ideations." *Id*. at 5. Thomas is an experienced litigator and, as he acknowledges, has filed "numerous complaints in the Northern District Courts of Illinois, Northern and Southern District Courts of Indiana." *Id*. at 12 (listing cases).

Of particular relevance to this case, Thomas has claims pending in *Thomas v. Carter, et al.*, cause no. 3:21-CV-448-CCB-JEM (N.D. Ind. Jun. 18, 2021). Amongst other claims, he is proceeding against various medical providers for "failing to provide him with constitutionally adequate treatment for his severe mental illness in violation of the Eighth Amendment while at the Miami Correctional Facility from March 9, 2021, through the present;" against several MCF officials and officers for "being deliberately indifferent to his severe mental illness in violation of the Eighth Amendment while at the Miami Correctional Facility from March 9, 2021, through the present;" against several high-level IDOC central office officials for "transferring him to the Miami Correctional Facility on March 9, 2021, and being deliberately indifferent to his severe mental illness in violation of the Eighth Amendment while there from March 9, 2021, through the present;" and against a combination of those defendants for placing and/or leaving him in indefinite segregation/restricted housing and for being deliberately indifferent to those conditions of confinement while housed at the Miami Correctional Facility in violation of the Due Process Clause of the Fourteenth Amendment and/or the Eighth Amendment from March 9, 2021, through the present[.]" *Id*. (*see* ECF 122 at 28–30). He was also granted leave to proceed against the Warden of MCF for "injunctive relief to ensure he receives constitutionally adequate treatment for his severe mental illness while at the Miami Correctional Facility[.]" *Id*. (*see id*. at 29). Accordingly, to the extent Thomas's current claims are duplicative of those in his other pending lawsuit, they will be dismissed. *See, e.g., Serlin v. Arthur Andersen & Co.*, 3 F.3d 221,

223 (7th Cir. 1993) ("As a general rule, a federal suit may be dismissed for reasons of wise judicial administration whenever it is duplicative of a parallel action already pending in another federal court.") (cleaned up).

*Current Allegations*

Beginning in February of 2023, Thomas claims he was housed in solitary confinement at MCF's "Maximum Security Prisons 23-hour lockdown segregation/Restricted Housing Unit [RHU]." ECF 1 at 5. He describes the cells in the RHU as concrete boxes with a solid steel door and a small window. There are no clocks anywhere. There is a concrete recreation pad but no exercise equipment. Thomas claims his cell was unsanitary, with a toilet that "backed-up and over flowed constantly." *Id*. at 6. The lights in his cell remained on twenty-four hours a day. In general, prisoners were not allowed to have TVs or a tablet "until (90) days clear of any write-ups and/or report of conducts." *Id*. at 7. Thomas claims the RHU is understaffed. Because the intercoms are often broken, prisoners have to "mule-kick" their doors if there is an emergency. Thomas hasn't been given seven-day or thirty-day periodic reviews and has had "no case management plan." *Id*. There are no crisis therapists on the RHU, no dialectical behavior therapy (DBT) programs or educational courses, and no group out-of-cell gatherings. It is excessively loud.

At some point—he doesn't say exactly when—the ventilation system "blew fumes from burned wires" which caused Thomas to experience "heartattack (sic) like symptoms, chest pains, numbness in my arm, and shortness of breath, and ringing in my ears." *Id*. at 6. He sent letters to Warden English and Assistant Wardens Byrum and Ertel about the ventilation issue, but they didn't respond. On April 20, 2023, he told Dr. Kuenzli about those symptoms, but Dr. Kuenzli didn't take any action. On May 22, 2023, he told Nurse Crites that he was having symptoms of a heart attack and had also experienced an epileptic seizure during recreation. Nurse Crites told

3

Thomas there was nothing he could do about it. On May 25, 2023, he explained his symptoms to Sgt. Huffman, but she "refused to call a signal 3000 to the medical department to help me get medical treatment." *Id*. at 8. On May 31, 2023, he told Sgt. Shuppard that he was having "symptoms of a heartattack (sic)" and needed to see medical, but Sgt. Shuppard told Thomas he didn't care if he died and wrote him a conduct report for interfering with staff duties. Later that same day, he was seen by Nurse Kline. Thomas told her he was experiencing "chest pains, numbness in my arm, and shortness of breath, and loud ringing in both my ears." *Id*. at 9. She tried to take his vitals, but she didn't succeed, so she told the officers to lock Thomas back up in his cell. Once inside, Thomas passed out.

Several hours later, Thomas was woken up at 2:35 A.M. on June 1, 2023,[1] and given nitroglycerin pills to relieve the "excruciating pain." *Id*. He was immediately transported to an outside emergency room where he was diagnosed with myocardial infarction. He was given more nitroglycerin pills and pain medication while at the hospital, and then he was sent back to the RHU at MCF.[2] The next day, he started feeling the same symptoms again. He told staff officials Ms. Owens and Ms. Myers that his mental health therapist had recommended he be removed from the RHU due to the fact that he was "still having symptoms of a heartattack (sic)," but they told him Ms. Tobin and Ms. Worden had denied the request for a transfer. *Id*. Later that night, Thomas saw Nurse Kline who checked his vitals, gave him nitroglycerin, and immediately sent him back to the emergency room. Thomas was admitted to the hospital for several days, where he had surgery "to remove the finger size clots off each side of my lungs." *Id*. at 10. He

---

[1] There is some discrepancy as to dates because the medical records Thomas attaches to his complaint indicate he was originally treated at the outside hospital on May 31, 2023. *See* ECF 1-1 at 1–30. For purposes of this order, the discrepancies aren't relevant, so the court will use the dates Thomas provides in his complaint.

[2] Medical documents attached to the complaint from the outside hospital indicate that as of June 1, 2023, it was determined Thomas had "Normal coronaries per cath No significant CAD with slow flow in the coronary arteries" and that he was "Stable to dc from cardiac standpoint." ECF 1-1 at 36.

4

was discharged with "strict out patient follow up orders for breathing treatments," but Dr. Kuenzli, Dr. Myers, Megan Reese, and Lee Ivers denied him those breathing treatments. As a result, he remained in pain and has been "forced to take meds for my heart and lungs." *Id*.

Thomas also suffers from hearing loss. He was supposed to have a follow-up appointment with an outside ear, nose, and throat specialist (ENT) in July of 2023 for his tinnitus and/or hearing loss, but he was never transported to the appointment. On September 22, 2023, Dr. Myers prescribed him misoprostol for the tinnitus instead. According to Thomas, the medication was later "discontinued due to sideffects (sic)." *Id*. Thomas claims Dr. Myers knew or should have known it was "used for abortion purposes and has nothing to do with curing tinnitus." *Id*.

Thomas has sued the sixteen individuals mentioned above for being deliberately indifferent to his needs by "delaying medical treatment and turning a blind eye to his heart attacks, tinnitus, and sinus lach-cardia (sic)." *Id*. at 11. He has also sued Centurion, the company responsible for providing healthcare services at MCF. He seeks "compensatory and punitive damages for physical injuries, emotional distress, mental anguish, suffering, personal humiliation, and other damages." *Id*.

*Eighth Amendment Deliberate Indifference – Individual Medical Claims*

The court will analyze Thomas's medical claims first because they make up the bulk of his complaint.[3] Inmates are entitled to constitutionally adequate medical care for serious medical conditions. *Thomas v. Blackard*, 2 F.4th 716, 722 (7th Cir. 2021). To establish liability under the Eighth Amendment, a prisoner must show: (1) his medical need was objectively serious; and (2)

---

[3] That said, because Thomas is already proceeding on Eighth Amendment claims for injunctive relief against the Warden for healthcare needs related to his ongoing mental illness in his other pending case, the court's analysis will focus on monetary damages claims for his heart, lung, and tinnitus issues. This is consistent with Thomas's own description of his current claims. *See* ECF 1 at 11.

5

the defendant acted with deliberate indifference to that need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)); *see Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing).

For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). As the Seventh Circuit has explained:

> [M]edical professionals are not required to provide proper medical treatment to prisoners, but rather they must provide medical treatment that reflects professional judgment, practice, or standards. There is not one proper way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field. A medical professional's treatment decisions will be accorded deference unless no minimally competent professional would have so responded under those circumstances.

*Id.* at 697–98. Put another way, inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997); *see Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The Eighth Amendment does not require that prisoners receive unqualified access to health care."). Rather, they are entitled to "reasonable measures to meet a substantial risk of serious harm." *Forbes*, 112 F.3d at 267.

Accordingly, deference must be given "to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (cleaned up). This standard "reflects the

6

reality that there is no single 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019) (cleaned up). Additionally, it is not enough that a medical professional be mistaken in his or her judgment. As noted above, the deliberate indifference standard requires a something "akin to criminal recklessness," *Thomas*, 2 F.4th at 722, rather than "negligence, gross negligence, or even recklessness," *Hildreth v. Butler*, 960 F.3d 420, 425–26 (7th Cir. 2020). Ignoring an inmate's complaints of pain or delaying necessary treatment can amount to deliberate indifference, particularly where the delay "exacerbates an inmate's medical condition or unnecessarily prolongs suffering." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) (cleaned up).

With regard to non-medical prison officials, they generally don't violate the Constitution it they "reasonably relied on the judgment of medical personnel." *Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021) (quoting *Miranda v. County of Lake*, 900 F.3d 335, 343 (7th Cir. 2018)). While prison officials are "presumptively entitled to defer to the professional judgment of the facility's medical officials on questions of prisoners' medical care[,]" they may not ignore a prisoner's complaints entirely or refuse to act if they know the medical staff is failing to treat the prisoner. *Id*. (cleaned up). That said, "[a]n official's 'mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient.'" *Id*. (quoting *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011)).

Here, Thomas claims he began experiencing heart-related symptoms such as chest pain, numbness of his arm, shortness of breath, and ringing in his ears in late April of 2023, which ultimately resulted in trips to the hospital between June 1–2, 2023, with diagnoses of myocardial infarction (*i.e.*, a heart attack) and blood clots in his lungs. He claims he directly told Dr. Kuenzli, Nurse Crites, and Nurse Kline about these issues, but they failed to provide him with

7

any treatment until he was in acute distress and was finally sent to the hospital. Giving Thomas the benefit of the inferences to which he is entitled at this stage, he has stated plausible Eighth Amendment claims for deliberate indifference against them. *See, e.g., Goodloe*, 947 F.3d at 1031 (explaining that medical professionals may be liable if they ignore pain or delay necessary treatment). He also claims he told Sgt. Huffman and Sgt. Shuppard about his symptoms, but they refused to call for help and Sgt. Shuppard responded that he didn't care if he died. Thomas will be allowed to proceed against these defendants as well. *See, e.g., Eagan*, 987 F.3d at 694 (explaining that guards may not ignore and refuse to act on inmate's serious medical issues).

As to several other officials, however, Thomas has failed to state any plausible medical claims against them. He alleges he sent letters and request for interview slips to Warden English, Assistant Warden Byrum, and Assistant Warden Ertel when the fumes began to blow from the ventilation system, which Thomas believes triggered his symptoms. He doesn't allege his communications with the Warden(s) advised them he was being denied medical care, so it's not plausible to infer these defendants were deliberately indifferent to his medical needs. *See Moderson v. City of Neenah*, 137 F.4th 611, 617 (7th Cir. 2025) ("A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation.") (citation omitted)); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 633 (7th Cir. 2017) ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009) (explaining that there is no general respondeat superior liability under 42 U.S.C. § 1983).

In a similar vein, the day after his first visit to the emergency room, he alleges he told Ms. Owens and Ms. Myers that he was still having symptoms and wanted to be transferred out of RHU, but they responded that Ms. Tobin and Ms. Worden—the classification specialists—had denied his request for a transfer. Because Thomas's request was for a transfer rather than for

immediate medical assistance, it can't be inferred that these defendants were deliberately indifferent to his medical needs either. *See Twombly*, 550 U.S. at 570 (A complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face."); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010).

Thomas further claims he was discharged from the hospital with orders for breathing treatments and that Dr. Kuenzli, Dr. Myers, Megan Reese, and Lee Ivers denied him those breathing treatments. He admits, however, that he has been given different medication to take for his heart and lungs. The simple fact that the hospital may have recommended breathing treatments but the prison doctors chose a different course of action doesn't plausibly show they were indifferent to his medical needs. *See Lockett*, 937 F.3d at 1024 (explaining that the Constitution doesn't demand one single way to practice medicine).[4]

Finally, Thomas claims he suffers from hearing loss/tinnitus but wasn't taken to a recommended follow-up appointment in July of 2023.[5] Instead, Dr. Myers prescribed misoprostol for the tinnitus on September 22, 2023. Thomas claims he experienced side-effects from the medication—he doesn't say what type or describe his symptoms in the body of his complaint, but in a request for health care attached to it, he claims he experienced "swelling in my face, lips, tongue and throat." ECF 1-1 at 144. He admits the medication was discontinued, but the complaint doesn't explain what happened after that. However, documents attached to it

---

[4] Moreover, the court notes that Thomas attaches medical documents to the complaint from June 5, 2023, which state, "Patient to be discharged on warfarin and bridging Lovenox dose to be continued until INR is greater than 2. Home oxygen evaluation *being done* and the patient qualifies, *will* let the facility [k]now the patient *would* need oxygen. . .. Medically stable for discharge." ECF 1-1 at 39 (emphasis added). The final discharge instructions mention the warfarin and Lovenox but do not mention the home oxygen, nor is home oxygen or "breathing treatments" mentioned anywhere else in the medical documents. *See id*. at 40. Accordingly, based on the verb tense of the emphasized language above, it may be assumed there was a typographical error with the word "if" being omitted before "patient qualifies." *See id*. at 39. While it was noted that Thomas should continue taking his previously prescribed albuterol inhaler "as needed for Wheezing" (*id*. at 45, 47), Thomas does not allege he has needed yet been denied his inhaler.

[5] The hospital discharge instructions attached to the complaint state, "You have an appointment with Dr. Phan, ENT, on 7/20 at 1:30 p.m. for hearing loss." ECF 1-1 at 40.

indicate he was seen by a provider the day after he submitted his request.[6] *Id*. He was later given an onsite "alternative treatment plan" that included an "audicus test" and was seen by a provider for his hearing issues "as recently as 8/15/24." *Id*. at 139.

Without more, the vague allegations in Thomas's complaint fail to state a claim against Dr. Myers or any of the other defendants related to this issue. One missed appointment with an ENT doesn't suggest deliberate indifference, especially in light of the physician's choice to pursue a different course of action instead. *See Walker*, 940 F.3d at 965 (explaining that a medical professional's treatment decisions are given deference). Although Thomas takes issue with the misoprostol because he claims it can be used for abortions, he doesn't suggest that is its only use. Indeed, the documentation he attaches to his complaint notes it is primarily used to reduce stomach acid and help protect the stomach lining from damage caused by other medications. *See* ECF 1-1 at 94. It's not uncommon for physicians to prescribe drugs for off-label purposes, especially when options for treatment are limited. According to the American Tinnitus Association, "[t]here is currently no scientifically validated cure for most types of tinnitus." *See American Tinnitus Association*, available online at: https://www.ata.org/about-tinnitus/why-are-my-ears-ringing/will-my-tinnitus-go-away (last visited Dec. 17, 2025).[7] Based on Thomas's allegations, it's not reasonable to infer Dr. Myers had preexisting knowledge of a

---

[6] Medical records indicate Nurse Crites triaged Thomas for an allergic reaction but noted "no edema to lips or face. . .. Throat appears WNL with no edema to tissue, inflammation or exudate noted. Tongue appears WNL." ECF 1-1 at 51. That said, the misoprostol was "held" and the medication administration record was updated to reflect the hold. *Id*. Thomas was referred to a provider for a follow-up visit "during an upcoming SC schedule." *Id*.

[7] Several studies suggest misoprostol may help some tinnitus sufferers. *See e.g.,* Akkuzu B, Yilmaz I, Cakmak O, Ozluoglu LN., *Efficacy of misoprostol in the treatment of tinnitus in patients with diabetes and/or hypertension. Auris Nasus Larynx.* 2004 Sep. 31(3):226-32. doi: 10.1016/j.anl.2004.03.005. PMID: 15364356., also available online at https://pubmed.ncbi.nlm.nih.gov/15364356/ (last visited Dec. 17, 2025) ("Misoprostol is an effective and safe treatment for chronic tinnitus in hypertensive and/or diabetic patients. Our results are encouraging, but further studies of larger series are needed.").

possible allergic reaction to the misoprostol or that it was otherwise contraindicated for Thomas's condition. As noted above, there is not a sole "proper way" to practice medicine in a prison setting, nor is Thomas entitled to demand specific treatment or specific medications. *See Jackson*, 541 F.3d at 697–98; *Walker*, 940 F.3d at 965. "A cause of action based on a physician's choice among courses of treatment cannot be sustained under the Eighth Amendment. . . . Whether that physician made a permissible decision under contemporary medical standards is, at best, a matter for state-law adjudication under its medical malpractice jurisprudence." *Eagan*, 987 F.3d at 692. Therefore, this claim will be dismissed. *See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th Cir. 2009) (explaining that a claim must be plausible on its face and complaint must provide adequate factual content).

<u>Eighth Amendment - Medical Claims Under Monell</u>

Thomas has also sued Centurion, a private company contracted with IDOC to provide medical care to inmates housed at MCF. There is no *respondeat superior* liability under 42 U.S.C. § 1983, and a private company can't be held liable for damages simply because it employed a medical professional who engaged in wrongdoing. *J.K.J. v. Polk County*, 960 F.3d 367, 377 (7th Cir. 2020). A private company performing a public function can be sued under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), but only if the "unconstitutional acts of their employees . . . were carried out pursuant to an official custom or policy." *Grieveson v. Anderson*, 538 F.3d 763, 771 (7th Cir. 2008) (citations omitted). The purpose of this requirement is to "distinguish between the isolated wrongdoing of one or a few rogue employees and other, more widespread practices." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021). To allege a viable *Monell* policy claim, the plaintiff must identify an official policy that caused him injury. *Grieveson*, 538 F.3d at 771. Alternatively, a plaintiff pursuing an official custom or practice theory "must allege facts that permit the

11

reasonable inference that the practice is so widespread so as to constitute a governmental custom." *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

Here, Thomas alleges Centurion has "unconstitutional policies, procedures, practices, and widespread customs in place related to (treatment) (evaluation) (delaying) and (denying) treatment to prisoners who have heart attacks sinus lachcardia (sic) and hearing loss." ECF 1 at 11. However, he doesn't cite to a specific policy or procedure that would subject Centurion to liability. *Swanson*, 614 F.3d at 403 ("[A] plaintiff must do better than putting a few words on paper that, in the hands of an imaginative reader, *might* suggest that something has happened to her that *might* be redressed by the law."). Moreover, while Thomas describes his own specific issues, he doesn't provide details to suggest there is a widespread custom in place at Centurion that causes these types of constitutional violations. *See id.; Howell*, 987 F.3d at 654 (explaining that an isolated wrongdoing and random events do not constitute a "true" corporate policy or custom). Therefore, this corporate defendant will be dismissed.

*Fourteenth Amendment Due Process/Eighth Amendment Conditions of Confinement Claims*

In addition to his medical claims, Thomas alleges his placement in RHU since February of 2023 has violated his Fourteenth and Eighth Amendment rights. The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV, § 1. That said, due process is only required when punishment extends the duration of confinement or imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). The Seventh Circuit has "concluded that inmates have no liberty interest in avoiding transfer to discretionary segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005) ("[R]eassignment from

12

the general population to discretionary segregation does not constitute a deprivation of a liberty interest.")); *see DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments.").

Although later cases have questioned the conclusion that placement in nonpunitive segregation can "*never* implicate a liberty interest," *Williams v. Brown*, 849 F. App'x 154, 157, n.3 (7th Cir. 2021) (emphasis added), timing plays a part in the analysis, even when conditions are significantly harsher. *See e.g., Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) ("Prisoners do not have a constitutional right to remain in the general population, . . . but both the duration *and* the conditions of the segregation must be considered in determining whether due process is implicated." (cleaned up)); *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 697–98 & nn.2–3 (7th Cir. 2009) (collecting cases that held segregation of two to ninety days does not trigger due process concerns and stating, "[i]n a number of other cases, we have explained that a liberty interest may arise if the length of segregated confinement is substantial *and* the record reveals that the conditions of confinement are unusually harsh") (emphasis added); *Lekas*, 405 F.3d at 612 (finding that up to ninety days in segregation does not affect liberty); *see also Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (recognizing "duration" is a component that plays a part in determining whether a liberty interest exists). Once an inmate shows a particular placement implicates a liberty interest, he has a right to a meaningful review, which periodically "evaluates the prisoner's current circumstances and future prospects, and, considering the reason(s) for his confinement to the program, determines whether that placement remains warranted." *Isby*, 856 F.3d at 527 (quoting *Toevs v. Reid,* 685 F.3d 903, 913–14 (10th Cir. 2012)).

The Eighth Amendment, on the other hand, prohibits conditions of confinement that deny inmates "the minimal civilized measure of life's necessities." *Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (citations omitted). An officer can violate the Constitution if he or she exhibits

13

deliberate indifference to hazardous conditions that may seriously harm an inmate. *Thomas*, 2 F.4th at 719. Deliberate indifference encompasses both objective and subjective components:

> A prisoner challenging conditions of confinement must first show that the conditions were sufficiently serious as an objective matter, meaning that they denied the inmate the minimal civilized measure of life's necessities, creating an excessive risk to the inmate's health and safety. Second, in covering the subjective component of the inquiry, the inmate must prove that prison officials acted with deliberate indifference—that they knew of and disregarded this excessive risk of harm to the inmate.

*Id*. at 719–20 (cleaned up). Put another way, an inmate can state a viable claim for deliberate indifference if he alleges the defendant "deliberately ignored a prison condition that presented an objectively, sufficiently serious risk of harm." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (citation omitted). "Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc*., 982 F.3d 451, 458 (7th Cir. 2020)); *see Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022) (stating that deliberate-indifference claims will fail absent evidence of "callous disregard" for inmate wellbeing). "Negligence, or even objective recklessness, is insufficient to satisfy deliberate indifference." *Stockton*, 44 F.4th at 615. Thus, a prison official that takes "reasonable steps" to prevent harm to a prisoner is not liable for subsequent injuries, even if the official acted negligently or did not act as quickly as possible to abate all risks. *Bagola v. Kindt*, 131 F.3d 632, 647-48 (7th Cir. 1997); *see Hunter v. Mueske*, 73 F.4th 561, 566 (7th Cir. 2023) (as long as a prison official takes measures "reasonably calculated" to address the risk faced by an inmate, he cannot be held liable under § 1983, even though he ultimately failed to prevent the injury).

Even assuming without deciding that both the length of time Thomas spent in RHU and the conditions rise to the necessary level, there is a general problem with Thomas's allegations—

14

whether viewed through a Fourteenth or Eighth Amendment lens, he hasn't tied them to any specific defendant(s) such that they would be subjected to individual liability. He names Ms. T. Worden and Ms. A. Tobin in the caption of his complaint, but the only reference he makes to them is that they denied a single request for a transfer during the period in 2023 when Thomas claimed he was experiencing heart issues. The same applies to case managers Ms. Owens and Ms. Myers, who simply relayed the denial information to Thomas. He doesn't suggest they were responsible for the initial decision to place him in RHU, for the lack of a case management plan/review, or for the overall conditions. Recall, Thomas has only requested monetary damages in this case and is proceeding against Ms. T. Worden and Ms. A. Tobin along with various high-level IDOC officials for the very same thing in his other pending case. *See Thomas v. Carter, et al.*, cause no. 3:21-CV-448-CCB-JEM (N.D. Ind. Jun. 18, 2021), ECF 122 at 28–30.[8] Without additional details as to their specific actions here, the court will not allow these duplicative claims to proceed. *See Moderson*, 137 F.4th at 617 ("A defendant cannot be held liable for a constitutional violation if she did not cause or participate in the alleged violation." (citation omitted)); *Aguilar*, 861 F.3d at 633 ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *see also Bissessur*, 581 F.3d at 602.

Thomas also claims he sent letters to Warden English, Assistant Warden Byrum, and Assistant Warden Ertel when fumes from burned wires began to blow from the ventilation system into his cell, but he doesn't suggest he complained to them about any of the other alleged conditions in RHU. He doesn't explain when the fumes began to blow into his cell or how long it lasted. Without more, Thomas's allegations don't suggest these defendants were deliberately

---

[8] On March 7, 2025, he was granted leave to proceed on his amended claims against the defendants in that case "for placing and/or leaving him in indefinite segregation/restricted housing and for being deliberately indifferent to those conditions of confinement while housed at the Miami Correctional Facility in violation of the Due Process Clause of the Fourteenth Amendment and/or the Eighth Amendment from March 9, 2021, through the present[.]" *See id.*, ECF 122 at 30.

15

indifferent to what can best be described as a maintenance issue. *See Moderson*, 137 F.4th at 617; *Aguilar*, 861 F.3d at 633 ("[T]he division of labor is critical to the efficient functioning of the [prison] organization."); *Burks*, 555 F.3d at 594 (explaining that there is no general respondeat superior liability under 42 U.S.C. § 1983); *see also Bissessur*, 581 F.3d at 602.

For these reasons, the court:

(1) GRANTS Leonard Thomas leave to proceed against Dr. C. Kuenzli, Nurse C. Crites, Nurse J. Kline, Sgt. Huffman, and Sgt. Shuppard in their individual capacities for compensatory and punitive damages for being deliberately indifferent to medical needs related to his heart and lungs from April through June of 2023 in violation of the Eighth Amendment;

(2) DISMISSES all other claims;

(3) DISMISSES Centurion, B. English, D. Byrum, C. Ertel, B. Myers, T. Worden, A. Tobin, S. Owens, M. Gapski, Lee Ann Ivers, Megan Reese, and K. Myers;

(4) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Sgt. Huffman and Sgt. Shuppard at the Indiana Department of Correction, with a copy of this order and the complaint (ECF 1);

(5) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Dr. C. Kuenzli, Nurse C. Crites, and Nurse J. Kline, at Centurion Health of Indiana, LLC, with a copy of this order and the complaint (ECF 1);

(6) ORDERS the Indiana Department of Correction and Centurion Health of Indiana, LLC to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

(7) **ORDERS**, under 42 U.S.C. § 1997e(g)(2), Dr. C. Kuenzli, Nurse C. Crites, Nurse J. Kline, Sgt. Huffman, and Sgt. Shuppard to respond, as provided for in the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED on December 22, 2025.

s/ Theresa L. Springmann  
JUDGE THERESA L. SPRINGMANN  
UNITED STATES DISTRICT COURT
